UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAMCO-GERSHENSON
PROPERTIES LP,

      Plaintiff,                                 Case No. 14-cv-10393
                                              Hon. Matthew F. Leitman

v.

PATTYWORLD INC. and
GK 4120 NW 12 INC.,

      Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR TRANSFER (ECF #7)

## INTRODUCTION

In 2010, Defendant Pattyworld Inc. ("Pattyworld") entered into a 10-year lease with Plaintiff Ramco-Gershenson Properties LP ("Ramco") for commercial space in a Ramco-owned shopping center in Florida. Defendant GK 4120 NW 12 Inc. ("GK") guaranteed Pattyworld's performance under the lease. Approximately two months after entering into the lease, Pattyworld attempted to terminate it. Ramco filed suit in this Court, asserting that the attempted termination was not timely and that Pattyworld and GK (collectively, the "Defendants") anticipatorily breached the lease and guaranty. Defendants have now moved to dismiss Ramco's claim for lack of personal jurisdiction or, in the alternative, to transfer the case to

the United States District Court for the Southern District of Florida.   For the reasons explained below, the Court denies Defendants' motion.

## FACTUAL BACKGROUND

### A.   The Parties

#### 1.   Ramco

Ramco is a Delaware limited partnership with its principal place of business in Farmington Hills, Michigan.  (Compl., ECF #1 at ¶1.)  All of Ramco's partners are Michigan citizens.  (*Id.*)

Ramco owns and operates retail shopping centers in Michigan and elsewhere in the United States.  (*Id.* at ¶7.)  One of Ramco's shopping centers, known as "The Crossroads," is located in Palm Beach County, Florida. (*Id.*)  Ramco administers leases for space in The Crossroads from its headquarters in Farmington Hills. (Decl. of Michael Sullivan, ECF #9-9 at ¶7.)

#### 2.   Pattyworld

Pattyworld is a New York corporation with its principal place of business in New York. (Decl. of Lowell Hawthorne, ECF #7-1 at ¶¶4-5.)  Pattyworld leases commercial real estate on behalf of its affiliated company, GK.  (*Id.* at ¶10.) Pattyworld has never leased or owned real estate in Michigan.  (*Id.* at ¶11.)

2

### 3.      GK

GK operates fast food restaurants serving Caribbean style food under the name "Golden Krust." (*See id.* at ¶12.)  GK is incorporated in Florida and operates out of New York. (*Id.* at ¶¶6-7.)  GK has never operated a restaurant or any other business in Michigan. (*Id.* at ¶13.)

Lowell Hawthorne ("Hawthorne") is the president of both Pattyworld and GK, and the two companies share the same New York headquarters. (*Id.* at ¶¶1, 2, 5, 7.)

### B.    Pattyworld Enters into a Lease With Ramco

Pattyworld, through its Florida-based real estate broker, Danielle Hanson ("Hanson"), identified The Crossroads as a potential location for a Golden Krust restaurant. (Hawthorne Decl. at ¶26.)  In or around August 2013, Pattyworld's Florida-based attorney, Sasha Watson ("Watson"), entered into discussions with Ramco's Florida-based retail leasing manager, Deirdre Morgan ("Morgan"), regarding a potential lease. (Decl. of Sasha Watson, ECF #7-2 at ¶7.)  The negotiations ultimately expanded beyond Florida, with the parties conducting "[p]ossibly one or more telephone calls between [D]efendants' office in Bronx, New York and [Ramco's] office in Michigan." (Hawthorne Dec. at ¶28(d).)  At some point during the negotiations, Morgan sent a draft lease to Pattyworld. (*See* Watson Decl. at 32, Pg. ID 180.)

After Watson proposed several changes to the draft lease on Pattyworld's behalf, Ramco's Michigan-based counsel, Karen Pifer ("Pifer"), became involved in the negotiations on behalf of Ramco.  (*See id*. at 26, Pg. ID 174.)  Between August 16 and 28, 2013, Watson and Pifer exchanged a series of emails regarding the proposed revisions.  (*See id*. at 6-26, Pg. ID 154-74.)  Each email that Pifer sent to Watson included a signature block that listed Pifer's address in Bloomfield Hills, Michigan.  (*Id.* at 22, 26; Pg. ID 170, 174)

As the negotiations over the draft lease intensified, the parties paid particularly close attention to a provision that required Pattyworld to submit periodic sale reports to Ramco in Michigan (the "sales report provision").[1]  (ECF #1-2, hereinafter the "Lease," at § 4.02; *see also* Watson Decl. at 10.)  On August 7, Watson initially proposed that the sales report provision be deleted.  (Watson Decl. at 32, Pg. ID 180.)  After Ramco did not delete the provision, on August 21, Watson again suggested that that it be removed from the Lease.  (*Id.* at 18, Pg. ID

---

[1]  The provision, as it appears in the Lease, states: "[Pattyworld] shall furnish to [Ramco] within ninety (90) days after the expiration of each lease year and partial lease year a complete statement … showing in all reasonable detail the amount of [g]ross [s]ales made by [Pattyworld] from the leased premises during period [sic]." While the provision, itself, does not mention Michigan, other provisions of the Lease, (*see* §§ 1.01(k) and 26.05), require Pattyworld to provide notices and other documents under the Lease to Ramco at Ramco's Michigan headquarters.  At the hearing before the Court, counsel for Defendants acknowledged that Pattyworld was obligated to provide the sales reports – and indeed to perform a host of obligations under the Lease – in Michigan.

4

166.)  Later that day, Morgan responded that Ramco was unwilling to delete the sales report provision.  (*Id.*)  Watson asked Morgan to "confirm the basis for the sales reports and how these sale [sic] reports will be used" by Ramco.  (*Id.* at 24, Pg. ID 172.)  Morgan responded that Ramco uses sales reports from its tenants "for [its] own internal purposes" to evaluate how a particular shopping center is performing.  (*Id.*)  The parties ultimately agreed to retain the sales report provision, although they appear to have reduced the frequency of the required reporting and lengthened the deadline after each period by which Pattyworld was required to submit its reports.  (*See* Lease at § 4.02; *see also* Watson Decl. at 10, 24, Pg. ID 158, 172.)

On August 27, Watson informed Pifer that Pattyworld was "in agreement with the terms of the [L]ease." (Watson Decl. at 8, Pg. ID 156.)  On September 4, in Bronx, New York, Hawthorne signed the Lease on behalf of Pattyworld.  (Lease at 33-34; Hawthorne Decl. at ¶21.)  That same day, Pattyworld sent the Lease to Pifer's office in Bloomfield Hills, Michigan.  (ECF #9-6 at 2, hereinafter the "Morrison Letter.")  Two Ramco principals executed the Lease at Ramco's headquarters in Farmington Hills, Michigan on September 10.  (Lease at 33-34; Sullivan Decl. at ¶5.)

Under the terms of the Lease, Pattyworld agreed to construct and, for a period of at least 10 years, operate a Golden Krust restaurant on an area known as

5

"Outlot A" at The Crossroads.  (Lease at §§ 1.01, 2.01, 2.02.)  The Lease provided

that the agreement would be "governed by, and construed in accordance with, the

laws of the State of Florida."  (*Id.* at § 26.15.)

## C.   The Lease Requires Pattyworld to Fulfill an Ongoing Series of Obligations in Michigan

Under the Lease, Pattyworld incurred a number of obligations to Ramco that

Pattyworld had to perform in Michigan.  These obligations primarily related to

deliveries – of documents, payments, plans, and other things – to Ramco at

Ramco's Michigan's headquarters.  More specifically, Section 1.01(k) of the Lease

listed Ramco's Michigan headquarters as Ramco's designated address under the

Lease, and Section 26.05 of the Lease required Pattyworld to provide specified

deliveries to Ramco at that address.[2]  At oral argument before the Court, counsel

for Pattyworld conceded that under these Lease provisions Pattyworld was

required to perform the Lease obligations described immediately below in

Michigan.

First, the Lease required Pattyworld to deliver a $16,300 security deposit to

Ramco in Michigan.  (*Id.* at 23.01)  Consistent with this requirement, Pattyworld

---

[2]   Section 26.05 of the Lease provides that "[u]nless specifically stated to the contrary in this Lease, any notice, demand, request, consent, approval or other instrument which may be or is required to be given [to Ramco] under this Lease shall be in writing … and shall be addressed  … to the address set forth in Section 1.01(k) hereof…."  (Lease, § 26.05.)

included a $16,300 security deposit in its September 4 letter to Pifer's office in Bloomfield Hills.   (*See* Morrison Letter.)   Thereafter, the Lease required Pattyworld to deliver all rent payments to Ramco's Michigan headquarters. (Lease at § 3.01.)

Second, the Lease required Pattyworld to perform construction-related tasks in Michigan.  For instance, the Lease obligated Pattyworld to submit to Ramco in Michigan "for [Ramco's] prior approval[,] all plans and specifications for the construction of all improvements to be located on the leased premises."  (*Id.* at § 6.04.)  In addition, if at any time after construction Pattyworld wished to alter the building, the Lease required Pattyworld to submit alteration plans to Ramco's Michigan headquarters for Ramco's prior approval.  (*Id.* at § 6.05.)

Moreover, from the date that Pattyworld took possession of the premises, Pattyworld was required to obtain insurance policies and provide copies of such policies to Ramco in Michigan.  (*Id.* at § 10.01.)  Pattyworld, in fact, obtained such policies and, as the Lease required, named Ramco as an additional insured on the policies.  (ECF #9-8 at 2.)  The certificate of insurance that Pattyworld provided to Ramco pursuant to the terms of the lease identified Ramco (at its Michigan address) as the "certificate holder."  (*Id.*)

The Lease also obligated Pattyworld to provide certain financial reports to Ramco in Michigan.  As discussed above, the sales report provision required

Pattyworld to submit annual reports on gross sales to Ramco in Michigan. (Lease at § 4.02.) In addition, upon Ramco's request, Pattyworld was required to provide financial statements to Ramco in Michigan. (*Id.* at § 26.09.) At any time during the term of the Lease, at Ramco's request, Pattyworld was required to deliver to Ramco's offices in Michigan an "off-set statement" certifying, *inter alia*, the effectiveness and commencement date of the Lease. (*Id.* at § 12.01.)

Other provisions in the Lease required Pattyworld to submit a notice or request to Ramco in Michigan. Specifically, the Lease required Pattyworld to:

- send any request to sublet the premises to Ramco in Michigan (*id.* at § 13.01);

- provide written notice of fire or accidents on the premises to Ramco in Michigan (*id.* at § 20.03);

- submit a request to terminate the Lease to Ramco in Michigan if Pattyworld wished to terminate after damage to and/or destruction of the premises (*id.* at § 15.02);

- provide a copy of all tax bills to Ramco in Michigan (*id.* at § 3.04(b)); and

- provide written notice to Ramco in Michigan if, at the end of the initial 10-year term of the Lease, Pattyworld wished to exercise its option to extend (*id.* at § 2.03).

**D.     GK Guarantees Pattyworld's Performance**

At the outset of negotiations, Ramco insisted that either Hawthorne or GK guaranty Pattyworld's performance throughout the term of the Lease.  (*See* Watson Decl. at 32, Pg. ID 180.)  Although Hawthorne declined to guarantee Pattyworld's performance in his personal capacity, he agreed that GK would provide a guaranty. (*Id.* at 30, 32; Pg. ID 178, 180.)  Accordingly, on the same date that Hawthorne executed the Lease on behalf of Pattyworld, he also executed a guaranty by GK. (*See* ECF #1-3, hereinafter the "Guaranty" at 3; *see also* Hawthorne Decl. at ¶23.)

GK guaranteed not only Pattyworld's payment of sums due under the Lease, but also Pattyworld's performance of all other contractual obligations.  Indeed, GK "guarantee[d] the full, faithful and timely payment *and performance* by [Pattyworld] of all of the payments, covenants, and other obligations of [Pattyworld] under or pursuant to the Lease."  (Guaranty at ¶A (emphasis added).) Accordingly, the Guaranty required GK to fulfill the terms of the Lease, including those tasks to be executed by Pattyworld *in Michigan*, on the same terms and to the same extent as Pattyworld was obligated under the Lease.

Like the Lease, the Guaranty was "made pursuant to, and shall be interpreted and applied in accordance with, the laws of the State of Florida."  (*Id.* at ¶L.)

9

**E.    The Lease Permits Pattyworld to Terminate Within 60 Days by Providing Written Notice to Ramco in Michigan**

Under certain limited circumstances, Pattyworld was permitted to terminate the Lease prior to the expiration of the 10-year term.  For instance, Pattyworld was permitted to terminate the Lease if, within 60 days of the date of the Lease, Pattyworld notified Ramco in writing that an "investigation[], survey[], environmental audit[], examination[], or test[]"  disclosed conditions that, in Pattyworld's sole judgment, made the premises unsuitable for operating a restaurant.  (*Id.* at § 2.04.)  The Lease required Pattyworld to deliver such a termination notice to Ramco's Michigan headquarters.  (*Id.*)

**F.    Pattyworld Attempts to Terminate Lease**

On November 13, 2013, by letter to Pifer's office in Bloomfield Hills, Pattyworld notified Ramco that it "intend[ed] to terminate the [Lease] … effective immediately."  (ECF #1-4 at 2, hereinafter the "Termination Letter.")  The Termination Letter explained that Pattyworld would be "unable to obtain the permits and approvals necessary to conduct the business that is the underlying basis for th[e] [L]ease."  (*Id.*)  The Termination Letter further stated that Pattyworld had discovered "certain structural limitations that would make the property unsuitable for the business to be conducted" and, therefore, "the conditions precedent to the [L]ease will not be met."  (*Id.*)

10

## PROCEDURAL HISTORY

On January 27, 2014, Ramco filed its Complaint against Pattyworld and GK in this Court.  Ramco alleged – and Defendants have not disputed – that this Court has diversity jurisdiction over the action under 28 U.S.C. § 1332.  (*See* Compl. at ¶6.)

In the Complaint, Ramco claims that the Termination Letter was not timely under the terms of the Lease.  (*Id.* at ¶¶14-15.)  Ramco alleges that Pattyworld's actions constituted an anticipatory repudiation of the Lease and that "Ramco is entitled to receive from Pattyworld annual rent and other charges" due under the Lease.  (*Id.* at ¶¶19-20.)  Ramco also asserts that, pursuant to the Guaranty, GK is "liable for Pattyworld's breaches and anticipatory repudiation" of the Lease.  (*Id.* at ¶24.)

On March 27, 2014, Defendants moved to dismiss Ramco's Complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction or, in the alternative, to transfer this action to the United States District Court for the Southern District of Florida.  (*See* ECF #7.)  The Court heard oral argument on Defendants' motion on June 20, 2014.  For the reasons discussed below, the Court now denies Defendants' motion.

11

## ANALYSIS

**A.     The Defendants Are Subject to Personal Jurisdiction in This Court**

**1.     Legal Standard Governing a Motion to Dismiss for Lack Personal Jurisdiction**

In diversity cases, "federal courts apply the law of the forum state to determine whether personal jurisdiction exists." *Miller v. AXA Winterthur Ins.*, 694 F.3d 675, 679 (6th Cir. 2012) (quoting *Nationwide Mut. Ins. Co. v. Tryg Int'l. Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1996). In a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of establishing jurisdiction. *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). Where, as here, the Court relies solely on written submissions and affidavits to resolve a motion under Rule 12(b)(2) – rather than resolving the motion after an evidentiary hearing or limited discovery – the burden on the plaintiff is "relatively slight." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988). To survive the motion, "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The Court must view the pleadings and affidavits in the light most favorable to the plaintiff, and the Court should not weigh "the controverting assertions of the party seeking dismissal." *Id.*

Personal jurisdiction may be either general or specific. *See Air Products & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549-50 (6th Cir. 2007). General

12

jurisdiction "depends on continuous and systematic contact with the forum state," whereas specific jurisdiction "grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." *Miller*, 694 F.3d at 679 (citing *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997).

In this case, Ramco has alleged only specific jurisdiction. (*See* ECF #9 at 15-16.) In order to for a court to exercise specific personal jurisdiction over a defendant in a diversity case, "the defendant must be amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution must be met." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (quoting *Reynolds v. Int'l. Amateur Athletic Fed.*, 23 F.3d 1110, 1115 (6th Cir. 1994)).

## 2. Defendants are "Amenable to Suit" under Michigan's Long-Arm Statute

Michigan's long-arm statute authorizes this Court to exercise personal jurisdiction over the Defendants. The statute provides that a non-resident company may be subject to jurisdiction in Michigan on claims "arising out of the act or acts which create any of the following relationships," including: "[t]he transaction of any business within the state…." MCL § 600.715(1). The "'slightest act of business in Michigan' is a sufficient business transaction for purposes of the statute." *Miller*, 694 F.3d at 679 (quoting *Neogen Corp. v. Neo Gen Screening,*

13

*Inc.*, 282 F.3d 883, 888 (6th Cir. 2002)).   In this case, Ramco has presented evidence that Defendants negotiated with Ramco's lawyers in Michigan; sent a security deposit and certain notices under the Lease to Ramco's lawyers in Michigan; and incurred a number of ongoing obligations to be performed in Michigan.   By taking these acts, Defendants transacted business within Michigan. *See, e.g.*, *Lanier v. Am. Bd. Of Endodontics*, 843 F.2d 901, 908 (6th Cir. 1988) (holding that a non-resident company had "transacted business" in Michigan through mail and telephone contacts with a Michigan resident).   Accordingly, Ramco has presented a *prima facie* case that Defendants are subject to Michigan's long-arm statute.   The Court will therefore proceed to the constitutional analysis.

### 3.   This Court's Exercise of Personal Jurisdiction over Defendants Comports with Constitutional Due Process

Constitutional due process requirements are satisfied when an out-of-state defendant has "minimum contacts" with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal citations omitted). In *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374 (6th Cir. 1968), the United States Court of Appeals for the Sixth Circuit established a three-part test for determining whether the exercise of personal jurisdiction satisfies due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities

14

there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* at 381.

### a.   Defendants Have Purposefully Availed Themselves of Acting in Michigan

In *Southern Machine*, the Sixth Circuit noted that the first prong of the test – personal availment – is the "sine qua non" for personal jurisdiction.  *Id.* at 381-82. The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts or of the 'unilateral activity of another party or third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  "Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State."  *Id.* (citation omitted and emphasis in original).

"Although entering into a contract with an out-of-state party *alone* does not automatically establish sufficient minimum contacts, the presence of certain factors in addition to the contract will be found to constitute purposeful availment." *Air Products*, 503 F.3d at 551 (quoting *Burger King*, 471 U.S. at 476) (emphasis in original).  Among the relevant factors are "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual

15

course of dealing." *Burger King*, 471 U.S. at 479.  A critical factor in this regard is whether the contract creates an ongoing relationship between the out-of-state party and a resident of the forum.  As the Supreme Court explained in *Burger King*, where a defendant "has created 'continuing obligations' between himself and the residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Id.* at 476 (internal citation omitted).

> **i.    Defendants' Continuing Obligations to Ramco in Michigan, Combined With Defendants' Other Contacts With Michigan, Amount to Purposeful Availment**

Through the Lease and Guaranty, Defendants incurred the very type of "continuing obligations" in Michigan that amount to purposeful availment under *Burger King*.  The contractual obligations in Michigan to which Pattyworld and GK assented were extensive.  Indeed, Pattyworld (and GK, in the event of a default by Pattyworld) obligated itself to submit construction plans to Ramco in Michigan (Lease at § 6.04), send rent payments to Ramco in Michigan (*id.* at § 3.01), submit alteration plans to Ramco in Michigan (*id.* at § 6.05), provide sales reports and financial statements to Ramco in Michigan (*id.* at §§ 4.02, 26.09), submit tax bills to Ramco in Michigan (*id.* at § 3.04(b)), and provide any notice due under the Lease to Ramco in Michigan (*id.* at § 26.05).  Importantly, Defendants undertook many of these obligations *for the entire 10-year duration of the Lease*.  The Lease

16

was thus not a one-time transaction, but rather a "continuing business relationship that lasted a period of many years." *Air Products*, 503 F.3d at 551.

Moreover, many of these continuing obligations to be performed in Michigan were essential elements of the Lease and/or were essential to Pattyworld's ability to open and operate in Florida. For instance, as Racmo informed Pattyworld during the negotiations, Ramco would not have entered into the Lease without Pattyworld's agreement to provide the sales reports – reports that Ramco needed in order to monitor the performance of the shopping center. Likewise, before Pattyworld could build out its leased premises, it had to submit its proposed construction plans to Ramco's design-review staff in Michigan and had to secure design approval from those Michigan-based Ramco staffers. Accordingly, this is not a case wherein Defendants merely submitted rent payments to an address in the forum state. *See Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 512 n.5 (6th Cir. 2006) (finding that a Kansas company's submission of rent payments to an Ohio address was, by itself, insufficient to support personal jurisdiction over the Kansas company in Ohio). On the contrary, Defendants agreed to send to Ramco's Michigan headquarters an ongoing flow of information that was essential to both (1) Pattyworld's ability to open and operate a restaurant on the leased premises and (2) Ramco's administration of the parties' relationship. In sum, by entering into the Lease and Guaranty, Defendants created

17

meaningful "continuing obligations" in Michigan and thereby "manifestly …
availed [themselves] of the privilege of conducting business there." *Burger King*,
471 U.S. at 476.

Defendants future contractual obligations in Michigan are not their sole ties
to Michigan.   On the contrary, Defendants have *already* transacted business in
Michigan.   Indeed, as the parties negotiated the terms of the Lease, Defendants,
through their attorney, exchanged several emails with Pifer, whom they knew to be
based in Michigan. (*See* Watson Decl. at 6-22, Pg. ID 154-170.)   Additionally,
Defendants do not dispute that at least once – and perhaps multiple times – a phone
conversation took place between Defendants in New York and Ramco in
Michigan.  (*See* Hawthorne Dec. at ¶28(d).)  Pattyworld sent documents executed
by Defendants and a security deposit check to Pifer's office in Michigan. (*See* the
Morrison Letter.)   Defendants also obtained a certificate of liability insurance
naming Ramco as the certificate holder and listing Ramco's address in Michigan
on the certificate.  (ECF #9-8 at 2.)  And when Defendants decided to terminate the
Lease, they sent the Termination Letter – addressed to Pifer at her Michigan office
address – to Pifer via email.  (ECF #1-4 at 2.)  As in *Air Products*, "Defendants
reached out beyond [their home state's] borders to conduct business with a
company whose principal place of business it knew to be Michigan.  Such contacts

18

are not 'random,' 'fortuitous,' or 'attenuated,' but are the result of deliberate conduct that amounts to purposeful availment."  503 F.3d at 551.

The facts of this case are analogous to *Burger King*, 471 U.S. at 462.  In that case, a Michigan resident entered into a 20-year agreement with Burger King to operate a franchise in Michigan.  The franchisee negotiated with Burger King's Florida headquarters and contractually obligated himself to submit payments and notices due under the agreement to Burger King in Florida.  When the business relationship soured, Burger King sued the franchisee in Florida.  The Supreme Court held that subjecting the franchisee to personal jurisdiction in Florida did not violate constitutional due process.  *Id.* at 487.  In finding that the franchisee "most certainly knew that he was affiliating himself" with a Florida-based enterprise, the Supreme Court noted that the contract itself "emphasize[d] that Burger King's operations are conducted and supervised from the Miami headquarters" and "all relevant notices and payments must be sent [to Miami]."  *Id.* at 480.  The Supreme Court also noted that "the parties' actual course of dealing repeatedly confirmed that decision-making authority was vested in the Miami headquarters."  *Id.*  In this case, as in *Burger King*, Defendants entered into a long-term agreement that obligated them to perform part of the contract in the forum state, and they were put on notice by the terms of the contract and the course of negotiations that Ramco's decision-making authority was located in the forum state.  Accordingly, here, as in

19

*Burger King*, the exercise of personal jurisdiction in the forum state "d[oes] not offend due process." *Id.* at 487.[3]

Moreover, a finding that Defendants purposefully availed themselves of acting in Michigan is consistent with Sixth Circuit precedent. For instance, in *Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998), the Sixth Circuit determined that a California resident who negotiated a surety agreement with an Ohio resident through the exchange of telephone calls and letters had purposefully availed himself of acting in Ohio. *Id.* at 436 ("If, as here, a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio"). Likewise, in *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220 (6th Cir. 1972), the Sixth Circuit held that the defendant corporation purposefully availed itself of the forum state when it made "a substantial business contract" with another party that it "necessarily knew" was based in the forum. *Id.* at 227, *abrogated on other grounds by Cole*,

---

[3] The contract in *Burger King* contained a Florida choice-of-law provision, and that provision supported the plaintiff's argument that the defendants were subject to personal jurisdiction in Florida. *See* 471 U.S. at 482. The Lease does not require application of Michigan law, and thus the case for asserting personal jurisdiction over the Defendants here is not quite as strong as the case for asserting personal jurisdiction over the defendants in *Burger King*. But given the other material similarities between the facts of this case and those of *Burger King*, the decision in *Burger King* provides significant support for the conclusion that the Defendants are subject to personal jurisdiction in Michigan.

133 F.3d at 436.   In this case, as in *Cole* and *In-Flight Devices*, Defendants purposefully availed themselves of acting in a forum state by negotiating with a resident of the forum and ultimately entering into a contract that created continuing obligations in the forum.

> **ii.   Although the Florida Choice-of-Law Provision in the Lease Weighs Against Purposeful Availment, It Is Insufficient, By Itself, To Defeat Personal Jurisdiction**

Defendants argue that the Florida choice-of-law provisions in the Lease and Guaranty demonstrate that Defendants did not purposefully avail themselves of acting in Michigan.   (*See* ECF #7 at 20-21.)   While the Florida choice-of-law provision does support Defendants' challenge to personal jurisdiction here, it is not sufficient to overcome the factors described above that support a finding of purposeful availment.

The Supreme Court addressed the role of choice-of-law provisions in personal jurisdiction analysis in *Burger King*.   There, the Supreme Court cautioned lower courts not to "ignore[]" a choice-of-law provision "in considering whether a defendant has purposefully invoked the benefits and protections of a State's laws for jurisdictional purposes."   471 U.S. at 482.   But a choice-of-law provision is just one of many factors that a federal court must consider in its personal jurisdiction analysis, and, importantly, the parties' choice of one state's law in a contract does not preclude a finding that those parties have purposefully availed themselves of

conducting business in a second state. *See Southern Machine*, 401 F.2d at 382-83. That is precisely what the Sixth Circuit held in *Southern Machine* where it analyzed the "business realities" of a transaction and concluded that the defendant purposefully availed itself of transacting business in Tennessee even though the parties' contract contained a New York choice-of-law provision. *Id.* Likewise, in *Cole, supra*, the Sixth Circuit ruled that a defendant was subject to personal jurisdiction in Ohio even though its contract with the plaintiff contained a California choice-of-law provision. *Cole*, 133 F.3d at 435-37.[4]

Defendants have not cited any precedent that compels the conclusion that because the Lease is governed by Florida law, they cannot be deemed to have purposefully availed themselves of acting in Michigan. When asked at the June 20th hearing to identify the single case most favorable to their position, Defendants

---

[4]    In addition, other circuit courts of appeals have held that a defendant in a contractual dispute may be subject to personal jurisdiction in a forum even if the contract at issue is governed by the law of a different forum. The key issue, according to these courts, is the defendant's contacts and relationship with the forum, not the contractual choice-of-law provision. *See, e.g.*, *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Foundation*, 297 F.3d 1343 (Fed. Cir. 2002) ("We are not persuaded that the inclusion of a foreign choice of forum and choice of law provisions … diminishes the significance of [defendant's] contacts with Kansas … As a contractual mater, these clauses may control. But as a constitutional matter … the Canadian choice of law clause[] fail[s] to undermine the sufficiency of [defendant's] contact with Kansas"); *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.*, 175 F.3d 867, 873 (5th Cir. 1999) ("[A]lthough the [a]greement contained a choice-of-Indian law clause, the multitude of contacts between [defendant] and Texas substantially outweighs the law choice factor").

cited *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293 (6th Cir. 1989). In *LAK*, a Michigan company sued an Indiana partnership in Michigan for breach of a real estate sale contract. The contract, for the sale of realty in Florida, provided that it was governed by Florida law. The Sixth Circuit held that the Indiana partnership was not subject to personal jurisdiction in Michigan. *Id.* at 1303. However, *LAK* is easily distinguishable from the present case. Crucially, the contract at issue in *LAK* was a one-off real estate transaction – it created no continuing obligations and it did not "provide for any significant continuing relationship…." *Id.* at 1296. Moreover, the Sixth Circuit stressed that the contract "did not require either [party] to take any action in the State of Michigan." *Id.* The facts in *LAK* thus contrast sharply with this case, wherein Defendants agreed to perform a series of actions – including paying rent, submitting design drawings and periodic reports, and providing required notices – in Michigan over a period of at least 10 years.

Moreover, *LAK* underscores that a choice-of-law provision is *not* dispositive when determining whether a party purposefully availed itself of acting in a forum. The Sixth Circuit acknowledged that the Florida choice-of-law provision weighed against a finding that the Indiana partnership purposefully availed itself of doing business in Michigan, but the court did *not* deem the choice of Florida law to be outcome-determinative. *Id.* at 1295. Instead, the court carefully evaluated the nature of the relationship created by the parties' contract – a one-time transaction

23

with no obligations in Michigan – and treated that issue as the most important in determining whether the Indiana partnership purposefully availed itself of acting in Michigan. *LAK* does not compel the conclusion that because the Lease is governed by Florida law, the Defendants did not purposefully avail themselves of doing business in Michigan. Although the choice-of-law provision in the Lease weighs in Defendants' favor, the provision does not outweigh the many continuing obligations Defendants created for themselves in Michigan.

**b.   Ramco's Claims Arise From Defendants' Activities in Michigan**

The second prong of the *Southern Machine* test is satisfied, as Ramco's claims for breach of the Lease and Guaranty arise from Defendants' activities in Michigan. Where, as here, a non-resident defendant purposefully avails himself of the forum state for the purposes of entering into a contract, and "the cause of action is for breach of that contract … then the cause of action naturally arises from the defendant's activities in [the forum state]." *Cole*, 133 F.3d at 436 (citing *Compuserve*, 89 F.3d at 1267; *In-Flight Devices*, 466 F.2d at 229). Because Defendants purposefully availed themselves of entering a contract in Michigan, it necessarily follows that Ramco's action for breach of that contract arises from Defendant's activities in Michigan.

24

### c.   This Court's Exercise of Jurisdiction over Defendants is Reasonable

The third prong of the *Southern Machine* test also is satisfied because this Court's exercise of jurisdiction over Defendants is reasonable.  Where, as here, a defendant purposefully avails himself of the forum and the cause of action arises directly from that contact, the court may "presume [that] the specific assertion of personal jurisdiction [is] proper."  *Cole*, 133 F.3d at 436 (citing *CompuServe*, 89 F.3d at 1268; *First National Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982).  Under this "inference of reasonableness … only [an] unusual case" will not satisfy the reasonableness requirement. *Air Products*, 503 F.3d at 554 (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir. 1991)).  Among the factors that a court should consider in assessing reasonableness are "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy."  *Id.* at 554-55 (citing *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005).

This case is not so unusual as to overcome the presumption that this Court's exercise of jurisdiction is reasonable.  "Although it would be a burden on [Defendants] to travel from [New York] for this litigation, Michigan clearly has an interest in protecting a company whose principal place of business is located in Michigan." *Id.* at 555.  And the burden on the Defendants of litigating in Michigan

25

is certainly no greater than that of litigating in Florida – a State that is further from their office in New York. Moreover, in light of Ramco's claim for breach of the Lease and Guarantee, which called for total rent payments of at least $1.6 million (*see* Compl. at ¶11), Ramco has a substantial interest in obtaining relief. On balance, these factors support the reasonableness of this Court's exercise of jurisdiction.

Defendants argue – incorrectly – that the location of The Crossroads in Florida is "the ultimate trump card" that compels the conclusion that this Court's exercise of personal jurisdiction would be unreasonable. (Reply, ECF #10 at 5.) In Defendants' view, "the location of the property in Florida transcends any reasonableness argument [Ramco] can make…." (*Id.* at 5-6.) However, Defendants have neither demonstrated why the location of the property controls nor shown that Florida has any interest whatsoever in the outcome of this litigation. Ramco seeks money damages from Defendants. (*See* Compl. at ¶¶20-22, 25-26.) To the extent that Ramco is successful, money would be paid from Defendants' headquarters in New York to Ramco's headquarters in Michigan. No relief sought in this action would in any way affect the property or any resident of the State of Florida. In fact, when asked at the June 20th hearing to identify how the result in this case, once the merits are reached, would have an effect on the

State of Florida, counsel for Defendants could identify no such impact.[5]  In sum, although the location of the property in Florida may be a relevant fact, it is by no means a "trump card" that renders unreasonable this Court's assertion of personal jurisdiction over Defendants.

**B.    Defendants' Motion to Transfer Venue Fails Because They Have Not Presented Sufficient Evidence to Justify a Transfer**

### 1.    Governing Legal Standard for Transfer

Defendants move to transfer this case to the Southern District of Florida pursuant to 28 U.S.C. § 1404(a).  That statute provides that "a district court may transfer any civil action to any other district or division where it might have been brought" when doing so serves "the convenience of parties and witnesses" and is "in the interest of justice."   28 U.S.C. § 1404(a).   Courts should weigh these considerations on an "individualized, case-by-case" basis. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).  "As the permissive language of the transfer statute suggests, district courts have 'broad discretion' to determine when party 'convenience' or

---

[5]  Florida certainly has an interest in how its laws are interpreted, but this Court is capable of fairly applying Florida law.  Indeed, it is far from unusual for a federal district court to apply the law of a different state.  *See, e.g.*, *Telerent Leasing Corp. v. Progressive Medical Imagining PLC*, 918 F.Supp.2d 666, 672 (E.D. Mich. 2013) (applying Pennsylvania law); *Berger Enterprises v. Zurich Am. Ins. Co.*, 845 F.Supp.2d 809, 813 (E.D. Mich. 2012) (applying Ohio law); *Harshaw v. Bethany Christian Servs.*, 714 F.Supp.2d 751, 763 (W.D. Mich. 2010) (applying Virginia law).

'the interest of justice' make a transfer appropriate." *Reese v. CNH Am. LLC*, 574

F.3d 315, 320 (6th Cir. 2009) (quoting *Phelps v. McClellan*, 30 F.3d 658, 663 (6th

Cir. 1994)).

     To succeed on a motion to transfer, "the movant must first show that the

case could have been brought in the transferee court." *Grand Kensington, LLC v.*

*Burger King Corp.*, 81 F.Supp.2d 834, 836 (E.D. Mich. 2000).[6]  Once it has been

determined that the case could have been filed in the transferee district, the district

court considers the following factors to determine whether to transfer a case:

> (1) the convenience of witnesses; (2) the location of relevant
> documents and relative ease of access to sources of proof; (3) the
> convenience of the parties, (4) the locus of the operative facts; (5) the
> availability of process to compel the attendance of unwilling
> witnesses; (6) the relative means of the parties; (7) the forum's
> familiarity with the governing law; (8) the weight accorded the
> plaintiff's choice of forum; and (9) trial efficiency and the interests of
> justice, based on the totality of the circumstances.

*Overland, Inc. v. Taylor*, 79 F.Supp.2d 809, 811 (E.D. Mich. 2000) (citation

omitted). In applying these factors, a court should keep in mind that "a plaintiff's

---

[6]  Under 28 U.S.C. § 1391(b), venue is proper in a judicial district where: (1) "any
defendant resides, if all defendants are residents of the State in which the district is
located"; (2) "a substantial part of the events or omissions giving rise to the claim
occurred, or a substantial part of property that is the subject of the action is
situated"; or (3) "any defendant is subject to the court's personal jurisdiction with
respect to such action," if "there is no district in which an action may otherwise be
brought."  28 U.S.C. § 1391(b).  There is no dispute that Ramco could have
brought this action in a Florida court.

choice of forum [is entitled to] substantial deference." *Audi AG and Volkswagon of America, Inc. v. D'Amato*, 341 F.Supp.2d 734, 749 (E.D. Mich. 2004).

The movant bears the burden of demonstrating, by a preponderance of the evidence, that "fairness and practicality strongly favor the forum to which transfer is sought." *Id.* (internal citation omitted). Transfer is not warranted when doing so will merely shift the inconvenience from one party to another. *Wayne County Employees' Retirement Sys. v. MGIC Invest. Corp.*, 604 F.Supp.2d 969, 975 (E.D. Mich. 2009).

## 2. Defendants Have Not Demonstrated That Transfer of Venue is Warranted

Defendants have presented virtually no evidence that transferring this case to the Southern District of Florida would be in the interest of fairness and practicality. Even assuming, as Defendants argue, that Ramco could have brought the case in the Southern District of Florida, transferring the case there would certainly *not* serve the convenience of the parties and the witnesses and would *not* be in the interest of justice.

### a. Several Factors Weigh Against Transfer

Several considerations clearly favor keeping this case in Michigan rather than sending it to Florida. For instance, the convenience of the parties weighs strongly against transfer. Ramco is based in Michigan, its representatives who signed the Lease are based in Michigan, and it administered the Lease from

29

Michigan. (*See* Sullivan Decl. at ¶¶2, 5, 7.) Defendants, on the other hand, are based in New York and have presented no evidence that they have any presence in Florida.[7] (*See* Hawthorne Decl. at ¶¶5, 7.) Retaining the case in Michigan would be convenient for Ramco, whereas transferring the case to Florida would not enhance convenience for either party.

The location of documents and ease of access to sources of proof also weigh against transfer. By Defendants' own admission, documents relating to the Lease and Guaranty are located at Ramco's headquarters in Michigan and Defendants' headquarters in New York. (*See* ECF #7 at 24.) Defendants argue, though, that documents relating to "the condition of the property, zoning issues, property conditions, as well as those associated with mitigation would be located in Florida." (*Id.*) However, Defendants do not identify with specificity the documents to which they refer or why such documents would be relevant in their defense of Ramco's claims. The mere existence of certain unidentified documents relating to the condition of the property in Florida is insufficient to warrant transfer when Defendants have failed to demonstrate that such documents would be

---

[7] Although GK is incorporated in Florida (Hawthorne Decl. at ¶6), its principal place of business is in New York (*Id.* at ¶7), and there is no evidence in the record that GK has any operations in Florida that would be relevant to the adjudication of Ramco's claims.

relevant in litigating this case on the merits.[8]  Because it is undisputed that relevant

documents exist in Michigan, this consideration weighs against transfer.

### b.      Some Factors are Neutral

Other considerations are neutral and do not help Defendants carry their

burden of justifying a transfer.  For instance, Defendants have not identified any

witnesses who would present relevant testimony at trial and whose convenience

would be enhanced by transferring the case to Florida.  Defendants note that

Watson, Hanson, and Morgan are located in Florida, but Defendants do not explain

why their testimony would be relevant at a trial on the merits.  Although Watson,

as Defendants' lawyer, and Morgan, as Ramco's leasing agent, could testify about

pre-Lease execution issues, it is not clear how such testimony would be relevant to

this dispute – which centers around termination, not negotiation, of the Lease –

and, in any event, such testimony could well be inadmissible pursuant to an

integration clause in the Lease.  (*See* Lease at § 26.02.)

Further, there is no evidence in the record that ties Hanson to the merits of

the dispute between the parties.  Although Defendants argue that Hanson could

testify about the condition of the property prior to the execution of the Lease, it is

---

[8]   Defendants also assert that the "primary operative facts" – such as "issues
surrounding the conditions of the property" – are in Florida (*see* ECF #7 at 25), but
again, they fail to explain why such facts would be relevant at a trial on the merits
of Ramco's breach of contract claims.

not clear why that testimony would be relevant since the basis of Ramco's claim is that Defendants' Termination Letter was not sent within the deadline for terminating the Lease for cause. Moreover, Defendants have not provided any specifics as to what testimony Hanson may be able to offer. In sum, the Defendants have failed to present evidence showing specifically how anyone located in Florida would provide relevant testimony at trial. Because Ramco has not identified any non-party witnesses in Michigan, the convenience of the witnesses is a neutral consideration.

Moreover, Defendants have failed to present evidence that the relative means of the parties favors transfer. Nor have Defendants identified any "unwilling" witnesses, and the ability to compel the attendance of unwilling witnesses is therefore not relevant. These factors therefore do not bolster Defendants' request for transfer.

### c. The Florida Choice-of-Law Provision is the Only Factor that Favors Transfer

Defendants correctly note that the Florida courts' familiarity with the law governing the Lease and Guaranty weigh in favor of transfer. However, this is the only factor that favors transfer, and although it is a relevant consideration, it falls far short of outweighing the many other factors that weigh against transfer.

32

2:14-cv-10393-MFL-MKM   Doc # 14   Filed 07/03/14   Pg 33 of 34   Pg ID 325

### d.   The Totality of the Circumstances Weighs Strongly Against Transfer

Based on the totality of the circumstances, the interest of justice favors keeping this case in Michigan.  As noted above, "Michigan clearly has an interest in protecting a company whose principal place of business is located in Michigan." *Air Products*, 503 F.3d at 555.  In contrast, Florida has little interest in an action for contract damages against New York-based companies.   "The balance of convenience, considering all the relevant factors should be strongly in favor of a transfer before such will be granted." *Jamhour v. Scottsdale Ins. Co.*, 211 F.Supp.2d 941, 946 (S.D. Ohio 2002).  In this case, the convenience of the parties, location of relevant documents and sources of proof, and the interests of justice weigh against transfer.  In contrast, Defendants have presented no evidence – other than the choice-of-law provision – that favors transfer.   Accordingly, Defendants have failed to meet their burden of showing why their preferred forum should prevail over the one chosen by Ramco.

### CONCLUSION

For all of the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss or transfer (ECF #7) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 3, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 3, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113